UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

————————————————————— x
LEE R. ELLENBURG III, Individually and On :   Civil Action No. 1:08-cv-10475-JGK
Behalf Of All Others Similarly Situated,   :
                                       :   MEMORANDUM OF LAW IN
                  Plaintiff,   :   OPPOSITION TO DEFENDANTS' MOTION
                                         :   TO DISMISS PLAINTIFF'S SECOND
      vs.                          :   AMENDED CLASS ACTION COMPLAINT
                                         :
JA SOLAR HOLDINGS CO., LTD, HUAIJIN   :
YANG and DANIEL LUI,              :
                                       :
                  Defendants.   :
————————————————————— x

# TABLE OF CONTENTS

**Page**

I.     PRELIMINARY STATEMENT ...................................................................................1

II.    STATEMENT OF FACTS ........................................................................................4

    A.     Background ...............................................................................................4

    B.     The August 12, 2008 Statements ..............................................................5

    C.     The September 16, 2008 Partial Disclosures .............................................6

    D.     The Full Truth Is Revealed .......................................................................7

III.   ARGUMENT ...........................................................................................................8

    A.     The SAC Pleads Actionable Misstatements and Omissions.......................8

        1.     Legal Standards...............................................................................8

        2.     Defendants Had a Duty to Disclose the Lehman Note When
              Discussing the Convertible Notes Offering so as Not to Mislead
              Investors About JA Solar's Financial Condition and Prospects .................9

        3.     Defendants' September 16, 2008 Statements Were Only Partial
              Disclosures ...................................................................................13

    B.     The SAC Adequately Alleges Scienter .................................................16

        1.     The SAC Adequately Alleges Defendants' Conscious Misbehavior
              or Recklessness ...........................................................................17

        2.     The SAC Adequately Alleges Defendants' Motive and
              Opportunity to Commit Fraud .......................................................21

    C.     The SAC Adequately Alleges Loss Causation .....................................24

IV.    CONCLUSION....................................................................................................25

# TABLE OF AUTHORITIES

**Page**

**CASES**

*Ashcroft v. Iqbal,*
    129 S. Ct. 1937 (2009)......................................................................................8

*ATSI Communs., Inc. v. Shaar Fund, Ltd.,*
    493 F.3d 87 (2d Cir. 2007)..............................................................................8

*Ballan v. Wilfred American Educ. Corp.,*
    720 F. Supp. 241 (E.D.N.Y. 1989) ................................................................16

*Bell Atl. Corp. v. Twombly,*
    550 U.S. 544 (2007).........................................................................................8

*Caiola v. Citibank, N.A., New York,*
    295 F.3d 312 (2d Cir. 2002)............................................................................9

*Crowell v. Ionics, Inc.,*
    343 F. Supp. 2d 1 (D. Mass. 2004) ...............................................................22

*DiLeo v. Ernst & Young,*
    901 F.2d 624 (7th Cir. 1990) ........................................................................13

*Dura Pharms. Inc. v. Broudo,*
    544 U.S. 336 (2005).......................................................................................25

*ECA & Local 134 IBEW Joint Pension Trust of Chicago v. JP Morgan Chase Co.,*
    553 F.3d 187 (2d Cir. 2009)....................................................................17, 21

*Edison Fund v. Cogent Inv. Strategies Fund, Ltd.,*
    551 F. Supp. 2d 210 (S.D.N.Y. 2008)...........................................................20

*Ganino v. Citizens Utils. Co.,*
    228 F.3d 154 (2d Cir. 2000)....................................................................16, 21

*Hall v. Children's Place Retail Stores, Inc.,*
    580 F. Supp. 2d 212 (S.D.N.Y. 2008).....................................................10, 16

*Halperin v. eBanker USA.COM, Inc.,*
    295 F.3d 352 (2d Cir. 2002)...............................................................9, 11, 16

*Heller v. Goldin Restructuring Fund, L.P.,*
    590 F. Supp. 2d 603 (S.D.N.Y. 2008).......................................................... 17

**Page**

*In re Able Labs. Sec. Litig.*,
  No. 05-2681 (JAG), 2008 U.S. Dist. LEXIS 23538
  (D.N.J. Mar. 24, 2008) ............................................................................................23

*In re Adaptive Broadband Sec. Litig.*,
  No. C 01-1092 SC, 2002 U.S. Dist. LEXIS 5887,
  (N.D. Cal. Apr. 2, 2002) ..........................................................................................19

*In re Alstom SA Sec. Litig.*,
  406 F. Supp. 2d 433 (S.D.N.Y. 2005) ............................................................12, 13, 18, 20

*In re APAC Teleservices, Inc. Sec. Litig.*,
  No. 97 Civ. 9145 (BSJ), 1999 U.S. Dist. LEXIS 17908
  (S.D.N.Y. Nov. 19, 1999) ........................................................................................24

*In re Ashanti Goldfields Sec. Litig.*,
  184 F. Supp. 2d 247 (E.D.N.Y. 2002) ....................................................................11, 12, 15

*In re Centerline Holdings Co. Sec. Litig.*,
  No. 08 Cw. 505 (SAS), 2009 WL 2391768
  (S.D.N.Y. Aug. 4, 2009) ..........................................................................................13

*In re GPC Biotech AG Sec. Litig.*,
  597 F. Supp. 2d 412 (S.D.N.Y. 2009), *vacated, dismissed on other grounds*,
  *In re GPC Biotech AG Sec. Litig.*,
  No. 07 Civ. 06728 (DC), 2009 U.S. Dist. LEXIS 26259
  (S.D.N.Y. Mar. 12, 2009) ........................................................................................23

*In re Initial Pub. Offering Sec. Litig.*,
  241 F. Supp. 2d 281 (S.D.N.Y. 2003) ........................................................................24

*In re Initial Pub. Offering Sec. Litig.*,
  544 F. Supp. 2d 277 (S.D.N.Y. 2008) ....................................................................24, 25

*In re Merrill Lynch & Co. Research Reports Sec. Litig.*,
  272 F. Supp. 2d 243 (S.D.N.Y. 2003) ........................................................................16

*In re MicroStrategy, Inc. Sec. Litig.*,
  115 F. Supp. 2d 620 (E.D. Va. 2000) ........................................................................24

*In re NTL Inc., Sec. Litig.*,
  347 F. Supp. 2d 15 (S.D.N.Y. 2004) ..........................................................................20

Page

*In re NYSE Specialists Sec. Litig.*,
   503 F.3d 89 (2d Cir. 2007) ......................................................................................8

*In re Oxford Health Plans, Inc. Sec. Litig.*,
   187 F.R.D. 133 (S.D.N.Y. 1999) ................................................................15, 21, 24

*In re Par Pharm., Sec. Litig.*,
   733 F. Supp. 668 (S.D.N.Y. 1990) ..........................................................................9

*In re Progress Energy, Inc. Sec. Litig.*,
   371 F. Supp. 2d 548 (S.D.N.Y. 2005).....................................................................16

*In re Providian Fin. Corp. Sec. Litig.*,
   152 F. Supp. 2d 814 (E.D. Pa. 2001) ......................................................................2

*In re Scholastic Corp. Sec. Litig.*,
   252 F.3d 63 (2d Cir. 2001)........................................................................9, 17, 21

*In re Time Warner, Inc. Sec. Litig.*,
   9 F.3d 259 (2d Cir. 1993).........................................................................................9

*In re Vivendi Universal, S.A. Sec. Litig.*,
   381 F. Supp. 2d 158 (S.D.N.Y. 2003).....................................................................15

*Katz v. Image Innovations Holdings, Inc.*,
   542 F. Supp. 2d 269 (S.D.N.Y. 2008)................................................................8, 25

*Lapin v. Goldman Sachs Group, Inc.*,
   506 F. Supp. 2d 221 (S.D.N.Y. 2006)...................................................................2, 9

*McMahan & Co. v. Wherehouse Entm't*,
   900 F.2d 576 (2d Cir. 1990).....................................................................................11

*Novak v. Kasaks*,
   216 F.3d 300 (2d Cir. 2000)................................................................................17, 21

*Phelps v. Kapnolas*,
   308 F.3d 180 (2d Cir. 2002).....................................................................................8

*Rothman v. Gregor*,
   220 F.3d 81 (2d Cir. 2000).......................................................................................21

*South Cherry St., LLC v. Hennessee Group LLC*,
   573 F.3d 98 (2d Cir. 2009)...........................................................................3, 17, 18

**Page**

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*
    551 U.S. 328 (2007)................................................................................17, 21

*Westwood v. Cohen,*
    838 F. Supp. 126 (S.D.N.Y. 1993) ..............................................................16

*Wielgos v. Commonwealth Edison Co.,*
    892 F.2d 509 (7th Cir. 1989) ......................................................................16

## STATUTES, RULES AND REGULATIONS

15 U.S.C.
    §78j(b)........................................................................................1, 8, 16, 25

Federal Rules of Civil Procedure
    Rule 9(b) ......................................................................................................8
    12(b)(6) ........................................................................................................8

17 C.F.R.
    §240.10b5-1(c).............................................................................................23

Lead Plaintiff Biao "Bill" Chen ("Plaintiff") respectfully submits this memorandum of law in opposition to Defendants' Motion to Dismiss Plaintiff's Second Amended Class Action Complaint (the "SAC" referenced herein as "¶__") filed by Defendants JA Solar Holdings Co., Ltd. ("JA Solar" or the "Company"), Huaijin (a.k.a. Samuel) Yang ("Yang"), Daniel Lui ("Lui"), and Baofang Jin ("Jin") (the "Individual Defendants") (collectively, "Defendants").

## I.    PRELIMINARY STATEMENT

This is a securities fraud class action brought on behalf of purchasers of American Depository Shares ("ADS") of JA Solar between August 12, 2008 and November 12, 2008, inclusive (the "Class Period"), alleging violations of §§10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder, against Defendants.

This is a straightforward case of securities fraud.  In May 2008, JA Solar, a company that was in dire need of cash, successfully raised $400 million in a Convertible Notes Offering.  Instead of placing those funds in a conservative investment vehicle, in July 2008, JA Solar loaned $100 million of its new capital to a subsidiary of Lehman Brothers Holdings Inc. ("Lehman") in the form of a principal-protected note (the "Lehman Note" or the "Note").  This loan was incredibly risky because, by the time it was made, it was already well-known in the public domain that Lehman, the entity that was also the guarantor of the Note, was experiencing severe financial distress.

By the start of the Class Period, Defendants had still not told investors that it had made this very risky loan to Lehman.  Instead, on August 12, 2008, Defendants made positive statements to investors about JA Solar's increased cash position as a result of the Convertible Notes Offering, including that the Company had a "high level of cash" heading into the second half of 2008.  ¶65. Defendants also misrepresented the nature of JA Solar's relationship with Lehman, by stating that JA Solar had engaged Lehman to "help manage" its cash, when Lehman's role was actually much different than simply advising JA Solar about where to invest its cash, since JA Solar had invested in a Lehman subsidiary and Lehman was guaranteeing that investment.  ¶119.

Under the federal securities laws, Defendants were legally obligated to disclose the existence

of the Lehman Note since their positive statements on August 12 put the status of the Company's financial condition "in play," *In re Providian Fin. Corp. Sec. Litig.*, 152 F. Supp. 2d 814, 824-25 (E.D. Pa. 2001), thereby creating a duty to disclose. *See Lapin v. Goldman Sachs Group, Inc.*, 506 F. Supp. 2d 221, 237 (S.D.N.Y. 2006) ("upon choosing to speak one 'has a duty to be both accurate and complete'"). In the absence of any disclosure about the Lehman Note (which was far removed from JA Solar's core operations as a solar cell manufacturer), investors were left completely in the dark about the nature and extent of the Company's risk exposure, and thus its true financial picture.

When Defendants finally told investors about the Note after Lehman filed for bankruptcy, they still downplayed the risk that JA Solar would lose its $100 million investment, by describing the Note as 100% principal protected, since it was issued by a Lehman subsidiary (even though that did not diminish the risk of loss because the Note was guaranteed by Lehman), and reassured investors that Lehman's bankruptcy would not impact the Company's outlook.

Investors, therefore, were understandably shocked when, despite these reassurances, JA Solar wrote off the Lehman Note as a complete loss at the end of the Class Period, and announced that Lehman's bankruptcy had in fact had a material impact on the Company and had caused net losses in the third quarter.

In moving to dismiss these well-plead allegations, Defendants mischaracterize this case as a "classic fraud by hindsight securities class action in which plaintiff seeks to capitalize on the unprecedented events that occurred in the credit markets in the second half of 2008." Def. Mem. at 1.[1] As detailed in the SAC, however, this case is not about whether JA Solar should have foreseen Lehman's bankruptcy or predicted that the Lehman Note would turn out to be a bad investment. Rather, as the SAC alleges, Defendants knew (or more importantly, should have known) – at the time that they made the investment – that the Lehman Note involved great risk since Lehman's

---

[1] "Def. Mem. at __" refers to Defendants' Memorandum of Law in Support of their Motion to Dismiss Plaintiff's Second Amended Class Action Complaint, filed on October 8, 2009.

severe financial difficulties and deteriorating creditworthiness were already well-known. Indeed, the risk that Lehman would default on its obligation to repay the Note by the time it matured was a "danger [that] was either known to [JA Solar] or so obvious that the [Company] must have been aware of it." *South Cherry St., LLC v. Hennessee Group LLC*, 573 F.3d 98 (2d Cir. 2009).[2] Thus, it was highly unreasonable for Defendants to make their positive statements during the Class Period about the Company's financial condition without making any disclosure of its $100 million exposure to the Lehman Note. Importantly, whether or not it was foreseeable that Lehman would file for bankruptcy does not minimize Defendants' disclosure obligations. Given Lehman's financial condition during the Class Period, and the sizable investment made by JA Solar, Defendants were obligated to advise investors of the Lehman Note so that they could then make their own assessment of the risk involved and their tolerance for such risk.

In addition to these allegations of recklessness, the SAC also alleges that Defendants Yang and Jin – who knew about the undisclosed Lehman Note – filed plans to sell substantial amounts of their shares in the weeks leading up to Lehman's bankruptcy. While Defendants argue that these planned sales are protected by 10b5-1 trading plans, which Yang and Jin supposedly intended to file after the expiration of a "lock-up" period that prevented any sales, they ignore that 10b5-1 plans may only be entered into when an insider is not in possession of material non-public information. Here, that was not the case since Yang and Jin's plans were filed while the Lehman Note was still undisclosed.

Lastly, Defendants argue that there can be no loss causation because there were no actionable misstatements or omissions. The SAC, however, identifies numerous actionable misstatements and omissions, rendering this argument moot.

Accordingly, for these reasons, and as set forth below in further detail, Defendants' Motion to Dismiss should be denied in its entirety.

---

[2] Citations and footnotes are omitted, and emphasis is added, unless otherwise noted.

## II.    STATEMENT OF FACTS

### A.    Background

JA Solar is a Chinese manufacturer of solar cells made from silicon wafers, which it sells to module manufacturers, who in turn assemble the cells for use in solar power systems. ¶¶2, 10, 27. Since its inception, JA Solar has required a high level of available cash in order to finance its aggressive capacity expansion plans, make prepayments on long-term silicon supply contracts, and provide a buffer against the effects of foreign currency fluctuations. ¶¶32-35, 39. In order to raise that cash, on May 12, 2008, prior to the start of the Class Period, JA Solar announced a Convertible Notes Offering, underwritten by Lehman, among others, which enabled it to raise $400 million. ¶36.

Then, less than two months later, on July 9, 2008, the Company entered into a material, highly risky transaction, about which it told investors absolutely nothing: JA Solar purchased the Lehman Note – a $100 million note, with a maturity date of October 9, 2008, from Lehman Brothers Treasury Co. B.V. ("Lehman Treasury"), a Lehman subsidiary incorporated in The Netherlands. ¶42. The Note was essentially a three-month loan by JA Solar to Lehman Treasury that was guaranteed by Lehman. ¶42. JA Solar's purchase of the Lehman Note used up $100 million of the $400 million in badly-needed cash that the Company had just raised in the Convertible Notes Offering. ¶43. In fact, JA Solar later disclosed in its 2008 Annual Report that the Company had used the largest portion of that $400 million to purchase the Lehman Note. ¶108.

Critically, there was a substantial risk that Lehman would be unable to repay the Note when it matured on October 9, 2008, due to Lehman's severe and rapidly-worsening financial distress. *See* ¶¶44-61. By June of 2008, concerns about Lehman's liquidity and credit-worthiness were mounting, after Lehman announced a second quarter loss of $2.8 billion stemming from write-downs of investments tied to risky sub-prime mortgage-backed securities, and the resignation of two of its top executives. ¶¶44, 46-47. By early July, Lehman's stock price had fallen approximately 65% since the start of the year, and Lehman was fending off widely-reported rumors that it was on the verge of collapse. ¶¶51-52. On July 8, 2008, the day before JA Solar purchased the Lehman Note, Platts, a

McGraw-Hill Companies pricing clearinghouse, suspended Lehman from participating in its Singapore oil trading pricing platform due to mounting market concern about Lehman's credit worthiness. ¶¶3, 45, 53, 117. Lehman's financial state continued to worsen between the time that JA Solar purchased the Lehman Note on July 9, 2008, and August 12, 2008, the start of the Class Period, with Merrill Lynch issuing a warning on July 29, 2008 that Lehman might post another loss and have to take additional write-downs in the third quarter. ¶¶57, 117. Investors' diminishing confidence in Lehman during the summer of 2008 is further apparent from the skyrocketing cost of credit default swaps issued on Lehman's debt (*i.e.*, the cost of insuring against the risk that Lehman would default on its debt), which increased correspondingly as Lehman's share price plummeted. ¶¶59, 117.

Despite the problems that Lehman was experiencing, Defendants did not tell investors anything at all about JA Solar's material risky loan until September 16, 2008, after Lehman filed for bankruptcy protection. ¶¶43-44. Thus, while Lehman's troubles were widely known, JA Solar's investors were unaware of JA Solar's substantial exposure to Lehman. ¶¶43-44, 61.

### B.    The August 12, 2008 Statements

On August 12, 2008, the start of the Class Period, JA Solar issued a press release and held a conference call regarding its financial results for the second quarter of 2008. ¶¶65, 67-68, 70, 72. Defendants discussed the Convertible Notes Offering, and the anticipated benefits from the $400 million in cash that it had generated, telling investors that:

- "Cash and cash equivalents *sequentially increased*" from $211.5 million in the first quarter of 2008, to approximately $520 million at the end of the second quarter of 2008 "*as a result* of" the closing of the $400 million Convertible Notes Offering. ¶65;
- "As we head into the second half of 2008, the Company has a *high level of cash* on hand" ¶70; and
- The $400 million raised in the Convertible Notes Offering, which the Company planned to use "for financing of our production capacity expansion and wafer material prepayment plans" had "*significantly strengthened [JA Solar's] competitive financial position*" and, at "a dynamic period in the industry and financial markets," had provided the Company with a "strong financial position" and the "necessary financial flexibility to take up any industry challenges and make strategic investments." ¶72.

Defendants also reiterated JA Solar's optimistic guidance for the full year 2008 of revenues "in the range of $1.05 [billion] to $1.17 [billion]," and discussed the Company's ambitious capacity expansion plans. ¶¶68, 76.

On the conference call, Defendant Lui stated that, during the second quarter, JA Solar had "engaged Credit Suisse, Lehman Brothers and Citigroup to help manage [the Company's] cash" by making "short-term investments" in "capital protected funds." ¶¶78, 80. Then, when an analyst asked about the "cash burn" that had occurred "[a]fter receipt of [the] $400 million," no disclosure was made that $100 million of the $400 million had been invested in the Lehman Note. ¶¶82-83. JA Solar's stock price climbed steadily in response to Defendants' positive announcements, reaching a Class Period high of $17.97 on August 25, 2008. ¶88.

As Lehman's financial state rapidly worsened, Defendants began to fear that they would be forced to disclose JA Solar's risky investment in the Lehman Note, and would potentially have to write off the Note's entire $100 million value as a loss. ¶¶6, 90. In anticipation of this, before the market learned the truth, between September 2, 2008 and September 8, 2008 – immediately after the expiration of the lock-up period following the Convertible Notes Offering – Defendants Yang and Jin filed plans to sell a total of 3 million ADS, through entities that they controlled, for gross proceeds of more than $55.5 million. ¶¶6, 90.

### C. The September 16, 2008 Partial Disclosures

After Lehman announced that it was filing for bankruptcy protection on September 15, 2008, JA Solar was finally forced to disclose the existence of the $100 million Lehman Note. ¶¶91-92. On September 16, 2008, the Company issued a press release and held a conference call telling investors about the Note for the first time. ¶¶7, 92, 97, 101, 103. However, Defendants also downplayed the risk that JA Solar would lose its $100 million investment as a result of Lehman's bankruptcy. ¶¶7, 93, 97, 102-04. For example, Defendants told investors that, "[b]ased on our review of the information made publicly available by Lehman, Lehman Brothers Treasury Co. B.V., the issuer with respect to this transaction, is not presently the subject of insolvency proceedings," and that

"[t]he agreements in question are with affiliates of Lehman Brothers Holdings Inc., some of which have not filed for bankruptcy protection."  Defendants made this representation even though the fact that the Note was purchased from a Lehman subsidiary did not mitigate JA Solar's exposure, since Lehman, as the Note's guarantor, was the entity ultimately obligated to pay.  ¶¶92-94, 97, 102, 104. Defendants also misleadingly described the Note as having "100% principal protection" – even though Lehman, which had guaranteed the Note, already filed for bankruptcy protection – and stated that "[a]t the end of the three months, there will be principal and interest returned to us."  ¶¶92, 97, 101.

Incredibly, despite the serious known risk that Lehman could default on its obligation to repay the Note when it matured in less than a month, and JA Solar would then be forced to take a charge against its earnings for the loss, Defendants told investors that: "***At this point, we do not foresee that these financial transactions with Lehman Brothers will impact our 2008 and 2009 outlook***.  As such, ***we are reconfirming our full year 2008 guidance*** with revenue in the range of RMB 7.22 billion (US$1.05 billion) to RMB 8.02 billion (US$1.17 billion) and gross margin in excess of 20%. . . ."  ¶¶7, 92, 95, 97, 101.

### D.    The Full Truth Is Revealed

On November 12, 2008, in a press release announcing its financial results for the third quarter, JA Solar finally disclosed the full impact of the Lehman Note: the Company had written off the entire $100 million investment as a loss, after Lehman defaulted on the Note when it matured on October 9, 2008.  ¶¶8, 106.   The Company also stunned investors by revealing that, "***[t]he bankruptcy of Lehman Brothers and its affiliates had a material impact on our third quarter net income and EPS***," contributing to a third quarter 2008 net income loss of $21.0 million, and basic and diluted losses per ADS of $.36 and $.13, respectively, compared to gains in the previous quarter and in the third quarter of 2007.  ¶106.

In response to JA Solar's November 12 announcements, the Company's stock plummeted to a closing price of $2.38 per ADS – a single day drop of 28.7%, and a decline of over 87% from the

Class Period high of $17.97 per ADS. ¶115. Analysts and investors were stunned that JA Solar had been forced to recognize a $100 million loss on the Lehman Note, and that Lehman's bankruptcy had in fact had a material impact on the Company's financial condition, since the Company had just reassured the market that its investment was not at risk due to Lehman's bankruptcy, and that Lehman's bankruptcy **would not** impact the Company's financial condition. ¶¶107-09.

## III. ARGUMENT

### A. The SAC Pleads Actionable Misstatements and Omissions

#### 1. Legal Standards

On a Fed. R. Civ. P. 12(b)(6) motion to dismiss, courts must "accept all allegations in the complaint as true and draw all inferences in the light most favorable to the non-moving party[]." *In re NYSE Specialists Sec. Litig.*, 503 F.3d 89, 95 (2d Cir. 2007). At issue on a 12(b)(6) motion "'is not whether a plaintiff is likely to prevail ultimately, but whether the claimant is entitled to offer evidence to support the claims.'" *Phelps v. Kapnolas*, 308 F.3d 180, 184-85 (2d Cir. 2002). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949, (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

On a motion to dismiss a federal securities fraud action,[3] in addition to the well-settled Rule 12(b)(6) standards, the Court must also consider the heightened pleading standards of the Private Securities Litigation Reform Act of 1995 ("PSLRA") and Fed. R. Civ. P. 9(b). *See Katz v. Image Innovations Holdings, Inc.*, 542 F. Supp. 2d 269, 272 (S.D.N.Y. 2008). According to the Second Circuit, the complaint "must (1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *ATSI Communs.*, 493 F.3d at 99. Even in light of these heightened

---

[3] To state a claim under for securities fraud under §10(b) of the Exchange Act, 15 U.S.C. §78j(b), and Rule 10b-5, "a plaintiff must allege that the defendant (1) made misstatements or omissions of material fact, (2) with scienter, (3) in connection with the purchase or sale of securities, (4) upon which the plaintiff relied, and (5) that the plaintiff's reliance was the proximate cause of its injury." *ATSI Communs., Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 105 (2d Cir. 2007).

pleading standards, however, a plaintiff is still not required to plead "detailed evidentiary matter." *See In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 72 (2d Cir. 2001). As set forth below, the SAC's allegations are more than adequate to satisfy these pleading standards.

### 2. Defendants Had a Duty to Disclose the Lehman Note When Discussing the Convertible Notes Offering so as Not to Mislead Investors About JA Solar's Financial Condition and Prospects

Rule 10b-5(b) makes it unlawful for a person, under certain circumstances, "'to make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, *in light of the circumstances under which they were made, not misleading*.'" "Recognizing that the materiality of an omission is a mixed question of law and fact, courts often will not dismiss a securities fraud complaint at the pleading stage of the proceedings, unless reasonable minds could not differ on the importance of the omission." *Halperin v. eBanker USA.COM, Inc.*, 295 F.3d 352, 356-57 (2d Cir. 2002). Defendants contend, wrongly, that they had no duty to disclose JA Solar's investment in the Lehman Note, and, therefore, the failure to do so could not have made their Class Period statements misleading as a matter of law.[4]

Although Rule 10b-5 does not create an affirmative duty to disclose all material nonpublic information in a company's possession (*see* Def. Mem. at 7-8), "the lack of an independent duty to speak in the first instance becomes irrelevant once a party chooses to discuss material issues, because upon choosing to speak one 'has a duty to be both accurate and complete.'" *Lapin*, 506 F. Supp. 2d at 237 (quoting *Caiola v. Citibank, N.A., New York*, 295 F.3d 312, 331 (2d Cir. 2002)); *see also In re Time Warner, Inc. Sec. Litig.*, 9 F.3d 259, 268 (2d Cir. 1993) (holding that "[a] duty to disclose arises whenever secret information renders prior public statements materially misleading"); *In re Par Pharm., Sec. Litig.*, 733 F. Supp. 668, 675 (S.D.N.Y. 1990) (once defendants chose to discuss a material issue, they were "obligated to speak truthfully and to make such additional disclosures as are necessary to avoid rendering the statements made misleading").

---

[4] Defendants do not dispute that the $100 million Lehman Note was a material investment, or that they failed to disclose the Note to investors until after Lehman had filed for bankruptcy.

- 9 -

Instead of disclosing the Lehman Note when JA Solar announced its second quarter financial results on August 12, 2008, Defendants told investors that "[c]ash and cash equivalents [had] sequentially increased . . . as a result of" the $400 million raised in the Convertible Notes Offering, and that JA Solar had "a high level of cash on hand" heading into the second half of 2008. ¶¶65, 70.[5] Defendants likewise characterized JA Solar's "financial position" as "strong" and "significantly strengthened" by the funds raised in the Convertible Notes Offering, which had given the Company "necessary financial flexibility" and which it planned to use "for financing of our production capacity expansion and wafer material prepayment plans." ¶72. During the conference call, Defendant Lui responded to an analyst's question about the "cash burn" that had occurred "[a]fter receipt of [the] $400 million" by stating that the "two big causes" were pre-payments on silicone supply contracts and capacity expansion, without disclosing that $100 million of the $400 million was also at risk because it had been loaned to Lehman. ¶¶82-83.[6]

Once Defendants spoke with investors at the start of the Class Period about the Company's cash position, and the anticipated benefits from the $400 million that JA Solar had raised in the Convertible Notes Offering, they clearly had a duty to disclose that JA Solar had subsequently loaned $100 million of those proceeds to Lehman. ¶¶65-68, 70, 72, 76, 82. This disclosure was necessary so as not to mislead investors about the Company's true financial condition, because there

---

[5] Defendants argue that this statement was not misleading because JA Solar accurately reported its level of cash and cash equivalents, since the Lehman Note was considered a cash equivalent, and it had more cash on hand than in December 2007 (*see* Def. Mem. at 12). Under the Company's own definition of "cash equivalent," however, the Lehman Note was not covered since it would have to be a "***highly liquid investment***[], with an original maturity of three months or less" – something that it clearly was not. Def. Mem. at 12, n.8 (emphasis added). It is reasonable to infer that had the Lehman Note been highly liquid, it would likely have been liquidated at some point by Defendants prior to its October 9 maturity; it was not. In any event, at a minimum, whether the Lehman Note was considered to be highly liquid is an issue of fact which is not appropriate for resolution on this motion. *See Hall v. Children's Place Retail Stores, Inc.*, 580 F. Supp. 2d 212, 229 (S.D.N.Y. 2008).

[6] These statements go well beyond simply repeating the Company's previous statements in May of 2008 describing the Convertible Notes Offering. *See* Def. Mem. at 9-10. Moreover, by the time that these statements were made in August 2008, Lehman's financial condition had only worsened.

was a significant risk that Lehman would not be able to repay the Note when it matured, since Lehman was under severe financial distress at the time, and would likely be facing additional losses and write-downs in the upcoming quarter (and because Lehman was the guarantor of the Note's principal).  ¶¶69, 71, 73-75, 77, 83.

By failing to disclose the existence of the Note and JA Solar's substantial exposure to Lehman, Defendants misled investors about the nature of the risks that JA Solar faced, and the nature of the risks to investors who purchased its ADS.  ¶¶44, 69, 71, 77.  Under Second Circuit law, Defendants' statements are therefore actionable.  *See McMahan & Co. v. Wherehouse Entm't*, 900 F.2d 576, 579 (2d Cir. 1990) ("the disclosure required by the securities laws is measured not by literal truth, but by the ability of the material to accurately inform rather than mislead prospective buyers"); *see also Halperin*, 295 F.3d at 357 (the relevant inquiry "is not whether isolated statements within a document were true, but whether defendants' representations or omissions, considered together and in context, would affect the total mix of information and thereby mislead a reasonable investor regarding the nature of the securities offered").

Defendants' attempt to characterize JA Solar's purchase of the $100 million Lehman Note as a routine investment, by arguing that companies have no obligation to constantly disclose every short-term investment, *see* Def. Mem. at 9, n. 5, obscures the significance of the transaction to JA Solar and its investors.  JA Solar's investors thought that they were buying stock in a small solar company, with the attendant risks, when the true nature of those risks was actually more akin to purchasing shares of an investment bank in the midst of the credit crisis, due to JA Solar's substantial exposure to Lehman.  *See In re Ashanti Goldfields Sec. Litig.*, 184 F. Supp. 2d 247, 262-64 (E.D.N.Y. 2002) (gold mining company's failure to disclose its speculation in gold futures was misleading and actionable because "unless otherwise warned, investors in . . . a gold mining company . . . would have every reason to believe that a rise in the price of gold would only serve to benefit [the company], not bring it to its knees," and thus Defendants "failed to reveal the extent of the risks taken on by the company").  Here as well, by not disclosing its investment in the Note,

which was far removed from JA Solar's core operations as a solar cell manufacturer, Defendants misled investors about the risks taken on by the Company and the status of its financial condition.

Defendants further misled investors when Defendant Lui stated that, during the quarter, the Company had "engaged Credit Suisse, Lehman Brothers and Citigroup to help manage [its] cash" by making "short-term investments" in "capital protected funds." ¶¶78, 80. That statement was misleading because in truth, Lehman was not merely "managing" JA Solar's cash, and the Company had not simply been advised by Lehman about where to invest its money; rather, JA Solar had invested $100 million of its cash *in* a Lehman subsidiary. ¶¶5, 79, 81. Given Lehman's publicly known, severe financial problems and deteriorating credit worthiness, this was no minor distinction. *See, e.g.*, *Ashanti Goldfields*, 184 F. Supp. 2d at 255-56 (description of gold futures investments as "hedging" was misleading when activity was actually speculation).

Seeking to invoke the routine refrain of fraud-by-hindsight, Defendants contend that JA Solar had no duty to disclose the Lehman Note because it could not have predicted Lehman's bankruptcy, or that Lehman Treasury would default on the Note. *See* Def. Mem. at 1, 10-12. Notably, the court in *In re Alstom SA Sec. Litig.*, 406 F. Supp. 2d 433 (S.D.N.Y. 2005), rejected this precise argument. In *Alstom*, the defendant company argued that it had no duty to disclose that it had guaranteed loans to a major customer because it could not have foreseen that the customer would file for bankruptcy shortly after September 11, 2001, and that the omission only became material in hindsight. *Id*. at 454. The court rejected this argument and held that the company's "***omission may have mislead*** [*sic*] ***investors . . . as to . . . the risk exposure*** that the financing had created for the company and the actual amount of potential liabilities [the company] had outstanding, ***and thus [its] true financial picture***. This alleged deception, in itself, gave rise to the duty to disclose. That the risk was realized after [the customer's] bankruptcy filing is not the determining consideration as to whether or not the information should have been disclosed." *Id*. at 454 (footnote omitted). Likewise, here, the SAC does not allege that Defendants should have predicted Lehman's bankruptcy, but rather, that by failing to disclose JA Solar's exposure to Lehman, Defendants misled investors about the

- 12 -

Company's true financial condition and prospects. Given that the $100 million was 25% of the sorely-needed cash that the Company had just raised, that "risk exposure [was] significant even if [JA Solar] had no particular reason to believe that [Lehman] would default" on the Note. *Alstom*, 406 F. Supp. 2d at 454, n. 12.

Defendants also contend that, despite Lehman's widely-known troubles, they had no reason to believe that the Note was a high-risk investment, since the Note was issued by Lehman Treasury. *See* Def. Mem. at 11, 13. This distinction carries little weight, however, because the Note was guaranteed by Lehman, meaning that although the Note was purchased from a Lehman subsidiary, Lehman was the entity ultimately responsible for repaying JA Solar's investment in the Note. ¶¶42, 103. Citing *DiLeo v. Ernst & Young*, 901 F.2d 624, 629 (7th Cir. 1990), an out-of-circuit, pre-PSLRA case, Defendants argue, alternatively, that if they did know that the Note might not be repaid, it would have been irrational for JA Solar to invest in the Note in the first place, and an irrational investment is unlikely to be fraudulent. Regardless of the wisdom of purchasing the Lehman Note, at bottom, it was still misleading for Defendants to tell investors about the anticipated benefits from the $400 million that the Company had raised in the Convertible Notes Offering without disclosing that JA Solar had subsequently made a substantial $100 million investment with those proceeds. The fact that JA Solar ***did*** have reason to believe that Lehman might default makes Defendants' omissions even more misleading. *See* ¶¶44-61.[7]

### 3. Defendants' September 16, 2008 Statements Were Only Partial Disclosures

Although JA Solar finally told investors about the Lehman Note on September 16, 2008, after Lehman filed for bankruptcy protection, Defendants' statements in the press release and during

---

[7] Defendants' reliance on *In re Centerline Holdings Co. Sec. Litig.*, No. 08 Cw. 505 (SAS), 2009 WL 2391768, at *26 (S.D.N.Y. Aug. 4, 2009) (*see* Def. Mem. at 8, 13), to argue that they had no duty to speak, is misplaced. In *Centerline*, the court found that no duty to disclose a transaction existed because the transaction was still "mere speculation" and was still being negotiated at the time that plaintiff alleged it should have been disclosed. *Id.* at 2009 U.S. Dist. LEXIS 67601, at *15-*16, n.56; *23-*24, n.68. Here, by contrast, the undisclosed information – JA Solar's purchase of the Lehman Note – had already taken place.

the conference call that day were still only partial disclosures, because they downplayed the risk that JA Solar would lose its $100 million investment in the Lehman Note, and misled investors about the impact that loss would have on the Company.  ¶¶7, 93, 95, 102, 104.

Defendants misleadingly reassured investors that Lehman's bankruptcy was unlikely to impact JA Solar's investment in the Lehman Note, by stating that, "[b]ased on our review of the information made publicly available by Lehman, Lehman Brothers Treasury Co. B.V., the issuer with respect to this transaction, is not presently the subject of insolvency proceedings," and that "[t]he agreements in question are with affiliates of Lehman Brothers Holdings Inc., some of which have not filed for bankruptcy protection."  ¶¶92-94, 97, 102, 104.  In reality, the fact that the Note was purchased from a Lehman subsidiary did not diminish JA Solar's exposure to Lehman, because Lehman Treasury was essentially a shell company, and Lehman, as the Note's guarantor, was the entity ultimately obligated to pay.  ¶¶94, 97, 103.[8]

Instead of speaking completely and accurately about the increased risk that JA Solar would lose its $100 million investment as a result of Lehman's bankruptcy, Defendants misleadingly described the Note as having "100% principal protection" and stated that "[a]t the end of the three months, there will be principal and interest returned to us."  ¶¶92, 97, 101.[9]

Defendants also reaffirmed the Company's guidance, telling investors that:  "We have sufficient cash to . . . support our . . . operating needs as we drive to profitability in 2009," and "*At*

---

[8]  In response to an analyst's question seeking details about JA Solar's investment in the Lehman Note, Defendant Lui stated that, "[a]ctually, I had disclosed this process our plan to the Street at the Q2 earnings announcement conference call."  ¶99.  In fact, JA Solar had not made any prior disclosures about the Lehman Note during the August 12, 2008 conference call, and as discussed above, Lui's statement that JA Solar had engaged Lehman to "help manage [the Company's] idle funds[,]" did not disclose that JA Solar's "process" and "plan" to invest its idle cash *with* Lehman actually included a $100 million investment *in* a Lehman subsidiary.  ¶100.

[9]  Defendants' "wait and see" approach, characterizing the situation as "fluid" and stating that "the ultimate impact . . . is expected to unfold over the next few months" did not meaningfully warn investors about the risk that Lehman would default on the Note when it matured in less than one month, on October 9, 2008.   ¶¶92, 97; *see* Def. Mem. at 14.

*this point, we do not foresee that these financial transactions with Lehman Brothers will impact our 2008 and 2009 outlook*. As such, *we are reconfirming our full year 2008 guidance*. . . ." ¶¶7, 92, 95, 97, 101.  Given the serious known risk that Lehman could default on its obligation to repay the Note when it matured and that JA Solar would lose its $100 million investment as a result of Lehman's bankruptcy and be forced to take a charge against its earnings for such loss, Defendants had no reasonable basis to tell investors that Lehman's bankruptcy was unlikely to impact the Company, or to once again reaffirm the Company's guidance – let alone to describe the Note as "100% principal protect[ed]."  ¶¶92, 97.  Those statements are therefore actionable.  *See, e.g.*, *In re Vivendi Universal, S.A. Sec. Litig.*, 381 F. Supp. 2d 158, 182 (S.D.N.Y. 2003) (statements that a company was "financially solid" were actionable where defendants did not have a reasonable basis for them); *In re Oxford Health Plans, Inc. Sec. Litig.*, 187 F.R.D. 133, 140 (S.D.N.Y. 1999) (statements downplaying computer and internal control problems were actionable because they misled investors into believing that the problems were not as extensive or as serious as they were).

Contrary to what Defendants argue, *see* Def. Mem. at 3, 14-15, Plaintiff does not allege that Defendants should have explicitly characterized the Note as "risky" or "speculated" that Lehman Treasury would default.  Rather, once Lehman – the Note's guarantor – filed for bankruptcy protection, JA Solar should have acknowledged the increased risk that its $100 million investment could be lost, and had a duty to meaningfully warn investors about that likelihood, as well as about the effects that a default would have on the Company's financial condition and prospects.  *See Ashanti Goldfields*, 184 F. Supp. 2d at 264 (rejecting company's argument that it had no duty to "predict" or "warn of the consequences" of a rise in the price of gold, and holding that, since it was "the type of event that could have and should have been anticipated," the company had "an obligation to . . . warn of the effect that a rise in the price of gold . . . would have on [the company's] hedge book").  Instead of doing so, however, Defendants: (i) described the Note as "100% principal protect[ed]," since it was issued by an affiliate of Lehman which had not filed for bankruptcy protection; (ii) told investors that "[a]t the end of the three months, there will be principal and

interest returned to us;" and (iii) reconfirmed the Company's guidance. ¶¶7, 92, 95, 97, 101. Ultimately, the loss of JA Solar's $100 million investment in the Lehman Note contributed to a third quarter 2008 net loss of $21 million (compared to a net profit of $24.4 million during the third quarter of 2007), and an EPS loss of $.13 per ADS. ¶¶113, 121. Taken "together and in context," *Halperin*, 295 F.3d at 357, the clear import of Defendants' September 16, 2008 statements was to convey to investors the misleading impression that Lehman's bankruptcy would not adversely affect JA Solar and its $100 million investment. ¶¶7, 93, 95, 102, 104.[10]

To the extent that Defendants contend that JA Solar's September 16, 2008 statements disclosed all relevant information about Lehman's bankruptcy and the Lehman Note, that argument raises a truth-on-the-market defense, which requires that "the corrective information . . . be conveyed to the public 'with a degree of intensity and credibility sufficient to counter-balance effectively any misleading information created by' the alleged misstatements." *Ganino v. Citizens Utils. Co.*, 228 F.3d 154, 167 (2d Cir. 2000). The mere fact that Defendants disclosed the existence of the Lehman Note on September 16, 2008 does not negate the fact that they also downplayed the significance of Lehman's bankruptcy filing to JA Solar. In any event, whether the relevant information was adequately disclosed is generally "a fact-intensive query that cannot be disposed of on a motion to dismiss." *Hall*, 580 F. Supp. 2d at 229.

## B.    The SAC Adequately Alleges Scienter

To state a claim under §10(b) and Rule 10b-5, a plaintiff must allege facts providing a strong

---

[10]  Contrary to Defendants' argument, this risk and impact was not the sort of "obvious" or "well known" information that companies need not spell out for investors. *See* Def. Mem. at 15 (citing *In re Progress Energy, Inc. Sec. Litig.*, 371 F. Supp. 2d 548, 552-53 (S.D.N.Y. 2005) (omitting discussing of tax law that was generally applicable to all corporations was not actionable); *Westwood v. Cohen*, 838 F. Supp. 126, 133, n. 12 (S.D.N.Y. 1993) (no duty to disclose FDA investigation that was already "known to the investing public and did not require sophisticated understanding"); *In re Merrill Lynch & Co. Research Reports Sec. Litig.*, 272 F. Supp. 2d 243, 250 (S.D.N.Y. 2003) (information contained in SEC filings was not concealed from the market); *Wielgos v. Commonwealth Edison Co.*, 892 F.2d 509, 515 (7th Cir. 1989) (no liability where company's projections had a reasonable basis, but turned out to be inaccurate); and *Ballan v. Wilfred American Educ. Corp.*, 720 F. Supp. 241, 248 (E.D.N.Y. 1989) (no duty to disclose possibility of indictments as soon as grand jury investigation was underway)).

inference that the defendants acted with scienter, *i.e.*, a mental state embracing intent to deceive, manipulate or defraud. *See ECA & Local 134 IBEW Joint Pension Trust of Chicago v. JP Morgan Chase Co.*, 553 F.3d 187, 198 (2d Cir. 2009). As the Supreme Court explained in *Tellabs, Inc. v. Makor Issues & Rights, Ltd*, while the inference of scienter "must be cogent and compelling," it "need not be irrefutable . . . or even the 'most plausible of competing inferences,'" but merely "*at least as likely* as any plausible opposing inference." 551 U.S. 308, 324 and 328 (2007) (emphasis in original). Thus a tie is sufficient to avoid dismissal. *See Heller v. Goldin Restructuring Fund, L.P.*, 590 F. Supp. 2d 603, 620, n. 14 (S.D.N.Y. 2008).

In the Second Circuit, the scienter requirement may be satisfied by alleging either: (1) facts constituting strong circumstantial evidence of conscious misbehavior or recklessness; or (2) facts which demonstrate that defendants had motive and opportunity to commit fraud. *See Scholastic*, 252 F.3d at 74. "The inquiry . . . is whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation scrutinized in isolation, meets that standard." *Tellabs*, 551 U.S. at 322-23 (emphasis in original).

### 1.    The SAC Adequately Alleges Defendants' Conscious Misbehavior or Recklessness

The Second Circuit has held that, to plead conscious misbehavior or recklessness through circumstantial evidence, a plaintiff must show, "conduct that 'at the least is highly unreasonable and which represents an extreme departure from the standards of ordinary care to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it.'" *South Cherry*, 573 F.3d at 109 (emphasis omitted); *ECA*, 553 F.3d at 198 (same). Moreover, "securities fraud claims typically have sufficed to state a claim based on recklessness when they have specifically alleged defendants' knowledge of facts or access to information that contradicted their public statements." *Novak v. Kasaks*, 216 F.3d 300, 308 (2d Cir. 2000). The key question is whether "defendants knew or, more importantly, should have known that they were misrepresenting material facts related to the corporation." *Id.*

Here, the SAC alleges the existence of specific facts that Defendants plainly knew, or should

have known, undermined their numerous positive public representations. As discussed above, during the summer of 2008, the public – and Defendants – knew that Lehman was experiencing a host of severe and worsening financial difficulties, including massive losses on investments in sub-prime mortgage backed securities, mounting market concern about its credit-worthiness, rumors that it was on the verge of collapse, a plummeting share price and skyrocketing cost of credit default swaps issued on its debt as investor confidence diminished, and analyst warnings of additional losses in the third quarter. ¶¶44-61, 117. Since Lehman's severe *financial problems* were widely known, regardless of whether anyone could have foreseen Lehman's *bankruptcy*, Defendants should have known that, at a minimum, their use of $100 million of the proceeds from the Convertible Notes Offering for a loan to Lehman was *risky* since, due to its precarious financial state, Lehman might not be able to repay the Note when it matured. ¶118. That risk was "the danger that was either known to the defendants or so obvious that the defendants must have been aware of it." *South Cherry*, 573 F.3d at 109.

Instead of maintaining their silence about the Company's cash position and the funds that it had raised from the Convertible Notes Offering, on August 12, 2008, Defendants: (i) represented that JA Solar was flush with cash from the recent $400 million Convertible Notes Offering; (ii) made positive statements about the Company's financial condition and the anticipated benefits from the capital that the offering had generated; and (iii) reconfirmed the Company's optimistic guidance. ¶118. Since JA Solar actually had $100 million less cash available due to its purchase of the Lehman Note, and risked losing that investment when the Note matured in the next quarter, Defendants knew or should have known that their statements materially misrepresented the Company's true financial condition and prospects. *See Alstom*, 406 F. Supp. 2d at 458 (scienter adequately pled where company's failure to disclose that it had extended "hundreds of millions of euros of [loan] guarantees to a financially unstable customer" "became increasingly unreasonable" as the risk of loss to the company grew along with the customer's financial difficulties). Likewise, here, Defendants were reckless in making positive statements about JA Solar's cash-rich position

while failing to disclose the substantial risk that the Company could lose its $100 million investment in the Lehman Note. Defendants were also reckless in misrepresenting that the Company had merely invested funds **with** Lehman, by stating that "[d]uring the quarter," JA Solar had engaged Lehman to "help manage" its cash – when JA Solar had actually invested **in** a Lehman subsidiary, which was borrowing the Company's cash with the backing of Lehman. ¶119.

Then, once Lehman, the Note's guarantor, filed for bankruptcy protection, the risk that JA Solar would lose its $100 million principal investment, and the fact that such a loss would have a material negative impact on the Company's financial condition and prospects, should have been even more apparent to Defendants. Yet Defendants still downplayed JA Solar's true exposure to Lehman, by describing the Note as "100% principal protect[ed]" and reassuring investors that "[a]t the end of the three months, there will be principal and interest returned to us," since the Note was issued by a Lehman subsidiary that was not the subject of the bankruptcy proceedings. ¶¶92, 97, 101. By telling investors that they did not anticipate that Lehman's bankruptcy would impact the Company's outlook, and reconfirming the Company's positive guidance, Defendants also, at a minimum, recklessly disregarded that if Lehman did default on the Note, that $100 million loss would certainly have a material negative impact on JA Solar's financial condition, prospects and earnings. ¶121. In fact, at the end of the Class Period, JA Solar ultimately admitted that Lehman's bankruptcy "had a material impact on [the Company's] third quarter 2008 net income and EPS," resulting in a net loss of $21 million (compared to a net profit of $24.4 million during the third quarter of 2007), and an EPS loss of $.13 per ADS. ¶¶113, 121.[11]

Notably, Defendants do not dispute that they had actual knowledge of the Lehman Note at

---

[11] The resignations of several high-level executives – including two of the Individual Defendants – that occurred in the wake of the Lehman Note debacle, further support an inference of scienter. JA Solar's President and Chief Operating Officer, Dr. Kang Sun, resigned on July 10, 2008, just one day after JA Solar purchased the Lehman Note, Defendant Lui stepped down from his position as the Company's CFO in January 2009, and Defendant Yang resigned as CEO in August 2009. ¶¶11, 62-63; *See In re Adaptive Broadband Sec. Litig.*, No. C 01-1092 SC, 2002 U.S. Dist. LEXIS 5887, at *43 (N.D. Cal. Apr. 2, 2002) (personnel changes were "highly suspicious" and "add[ed] one more piece to the scienter puzzle").

the time of its purchase and when they spoke about the Company's cash position at the start of the Class Period. Instead, Defendants mischaracterize the SAC's scienter allegations as fraud by hindsight, by arguing that JA Solar could not have foreseen that Lehman's publicly disclosed financial difficulties would result in Lehman filing for bankruptcy and defaulting on the Note, and the most plausible inference is that JA Solar simply made what turned out to be a foolish investment. *See* Def. Mem. at 22-24. However the SAC does not allege that Defendants are liable because the Note *was* a bad investment or because Defendants should have predicted that the Note would *turn out to be* a bad investment.[12] Rather, Plaintiff's allegations are that Defendants knew that the Company had *purchased the Lehman Note which they knew was risky*, but nevertheless they chose to make positive statements about the Company's financial condition without disclosing the existence of the Note or the risk attached to it. *Accord Alstom*, 406 F. Supp. 2d at 459, n. 18 (rejecting fraud by hindsight argument because the company "would not have had to be 'clairvoyant' to be aware of [a customer's] allegedly unstable financial condition prior to the bankruptcy"). Instead of disclosing that risky investment, Defendants concealed JA Solar's substantial exposure to Lehman from investors until after Lehman's bankruptcy, misled investors about the nature of JA Solar's relationship with Lehman by stating that Lehman was merely helping to manage JA Solar's cash, and downplayed the likelihood that JA Solar would lose its $100 million investment in the Note and the impact that loss would have on the Company.[13] Taking the SAC's allegations

---

[12] Plaintiff's claims are not of mismanagement, but concern the false statements made by Defendants. *See In re NTL Inc., Sec. Litig.*, 347 F. Supp. 2d 15, 27 (S.D.N.Y. 2004) ("The essence of plaintiffs' claims here, to the extent they involve corporate mismanagement, is that the failure to disclose NTL's internal problems rendered statements that NTL did make misleading. Thus, they do not rely on mismanagement per se but on alleged deception. Defendants' argument therefore lacks merit.").

[13] Defendants' reliance on *Edison Fund v. Cogent Inv. Strategies Fund, Ltd.*, 551 F. Supp. 2d 210, 228 (S.D.N.Y. 2008), where this Court rejected an allegation that defendants should have anticipated future difficulty in the market for sub-prime automobile loans, is misplaced. In *Edison Fund*, plaintiffs alleged that a series of letters from a credit union should have placed defendants on notice of problems with the subprime loan market, which then should have been disclosed. In rejecting this argument, this Court held that while the "letters did caution credit unions to monitor their subprime lending relationships, the same letters made note of the growth in such third-party lending arrangements and even made positive statements about them." *Id.* at

collectively and accepting them as true, the inference that Defendants "knew or . . . should have known," *Novak*, 216 F.3d at 308, that they were misrepresenting JA Solar's true financial condition and prospects by making positive statements about its financial condition and concealing its substantial exposure to Lehman, is at least as likely as the inference that Defendants were justifiably unaware of the risks posed by the Lehman Note. *See Tellabs*, 551 U.S. at 328.

### 2. The SAC Adequately Alleges Defendants' Motive and Opportunity to Commit Fraud

Since Plaintiffs have established a strong inference of Defendants' scienter by alleging their conscious misbehavior or recklessness, it is not necessary to allege motive and opportunity. *See Ganino*, 228 F.3d at 170. Nonetheless, allegations of motive and opportunity may serve to further strengthen an inference of scienter. *See Rothman v. Gregor*, 220 F.3d 81, 93-94 (2d Cir. 2000); *see also Tellabs*, 551 U.S. at 325 (allegations of insider trading "may weigh heavily in favor of a scienter inference"). Here, Plaintiff alleges planned insider stock sales as one factor contributing to an inference of scienter.

In the Second Circuit, "the 'motive' showing is generally met when corporate insiders allegedly make a misrepresentation in order to sell their own shares at a profit." *ECA*, 553 F.3d at 198. Stock sales by insiders usually imply a strong inference of scienter when those sales are "unusual." *Scholastic*, 252 F.3d at 74. Sales may be unusual because of "the amount of profit from the sales, the portion of the stockholding sold, the change in volume of insider sales, and the number of insiders selling." *Id*. at 74-75. A court will also consider the timing of the sales. *Oxford Health*, 187 F.R.D. at 139. However, there is no minimum level of sales at which insider trading becomes unusual *per se*; rather, each case must be decided on its own facts. *Scholastic*, 252 F.3d at 74.

Here, the planned insider sales are highly unusual, particularly when considered in context. At the same time that Defendants were concealing JA Solar's $100 million investment in the

---

222. Here, by contrast, there is no dispute that Lehman's financial difficulties were extensive at the time that JA Solar purchased the Lehman Note and that there were no positive statements being made about Lehman's financial situation.

Lehman Note, and Lehman's financial state was rapidly worsening, between September 2, 2008 and September 8, 2008, Defendants Yang and Jin filed plans to sell 3 million ADS through entities that they controlled, for gross proceeds of more than $55.5 million. ¶6. Yang and Jin knew that the Lehman Note would have to be disclosed once Lehman filed for bankruptcy protection, which they feared was imminent, and they therefore rushed to try to sell their personal shares before then. ¶122.

Between September 2, 2008 and September 8, 2008, over the course of five trading days, Defendant Yang filed plans on four separate occasions to sell JA Solar shares through Improve Forever, an entity owned by a trust of which he is the sole director and primary beneficiary. ¶123. Yang planned to sell a total of 1 million ADS at prices ranging between $15 and $17.09 per ADS, which would have resulted in gross proceeds of over $15.5 million. ¶¶123, 126. As the price of JA Solar's ADS declined steadily during those five days – a trend that Yang knew would continue once investors learned the truth about the undisclosed Lehman Note – Yang frantically increased his plan to sell JA Solar shares, filing for the planned sale of an additional 600,000 ADS on September 8, 2008. *Id*. On September 2, 2008 – the same date that Yang began filing for his planned sales – Defendant Jin filed a plan to sell shares through Jinglong Group, JA Solar's largest shareholder (with a 24% stake in the Company). ¶124. Defendant Jin, in turn, owns a 32.96% equity interest in Jinglong Group, and serves as its Chairman and CEO. *Id*. Jin, through Jinglong Group, planned to sell 2 million ADS at $20 per share for gross proceeds of $40,000,000, from which Jin would have reaped approximately $13,184,000 in personal profits. ¶¶124, 126.

While it does not appear that Yang and Jin carried out these planned sales, that does not undermine their motive to mislead investors, because they likely hoped to profit from insider sales before JA Solar was forced to disclose the Lehman Note, but simply waited too long to successfully do so. Once Lehman filed for bankruptcy and JA Solar disclosed the Note, the Company's plummeting share price meant that Defendants were unable to realize the profits that they had hoped for. *See Crowell v. Ionics, Inc.*, 343 F. Supp. 2d 1, 15 (D. Mass. 2004) ("[T]he absence of stock trading profit does not establish the absence of a scheme to profit through insider trading. It only

establishes the absence of a successful scheme. The . . . Defendants could have commenced a fraudulent scheme, in hopes of profiting from insider trading, but simply have waited too long to sell").

Defendants argue that these planned sales are not suspicious because, at the time of the Convertible Notes Offering, Yang and Jin announced that they intended to enter into 10b5-1 trading plans, and agreed to a "lock-up period" during which they would not sell any of their shares. *See* Def. Mem. at 19-20. This argument conveniently ignores one crucial fact: a Rule 10b5-1 trading plan can only be established when the insider participating *is not in possession of any material non-public information*. *See* 17 C.F.R. §240.10b5-1(c) (providing that insider sales "will not be considered to be "'on the basis of' material non-public information if the person making the purchase or sale demonstrates that: (A) [b]efore becoming aware of the information, the person had: . . . (3) [a]dopted a written plan for trading securities"). Since Yang and Jin adopted their trading plans *after* JA Solar purchased the Lehman Note and *before* disclosing the Note to investors, the plans were entered into while Defendants were in possession of material non-public information, and support Plaintiff's scienter allegations. *See In re GPC Biotech AG Sec. Litig.*, 597 F. Supp. 2d 412, 418, 426 (S.D.N.Y. 2009), *vacated, dismissed on other grounds*, *In re GPC Biotech AG Sec. Litig.*, No. 07 Civ. 06728 (DC), 2009 U.S. Dist. LEXIS 26259 (S.D.N.Y. Mar. 12, 2009) (scienter was established where defendants sold shares under a 10b5-1 trading plan because plaintiffs alleged that the plans "were created after . . . [d]efendants learned of the [material] non-public information").[14]

Defendants also contend that Jin and Yang's planned sales do not support an inference of scienter because the portion of shares they planned to sell was not material, and because Defendant

---

[14]  In any event, the validity of a 10b5-1 trading plan prematurely raises an affirmative defense that is inappropriate on this motion. *See In re Able Labs. Sec. Litig.,* No. 05-2681 (JAG), 2008 U.S. Dist. LEXIS 23538, at *103, n. 40 (D.N.J. Mar. 24, 2008) ("10b5-1 trading plan does not provide an absolute defense to a claim of insider trading. Rather, it requires an additional factual finding of good faith. Not only can this Court not make such factual findings when considering a motion to dismiss, but this Court must also draw all inferences in favor of the non-moving party.").

Lui did not sell plan to sell any shares.  *See* Def. Mem. at 21.  However, cases alleging far less egregious insider selling than what is alleged here have been held to satisfy the motive and opportunity element of scienter.  *See, e.g.*, *Oxford Health*, 187 F.R.D. at 140 (holding that stock sales were suspicious where certain insiders separately sold between $621,000 and $5.4 million worth of stock); *In re Initial Pub. Offering Sec. Litig.*, 241 F. Supp. 2d 281, 365-66 (S.D.N.Y. 2003) ("Where corporate insiders engaged in 'unusual insider trading activity,' *i.e.*, sold hundreds of thousands of dollars worth of inflated stock, the motive prong is plainly satisfied."); *see also In re MicroStrategy, Inc. Sec. Litig.*, 115 F. Supp. 2d 620, 647 (E.D. Va. 2000) (refusing to hold that insider sales did not create an inference of scienter simply because defendants sold less than 5% of their shares).  Here, the volume and value of the planned insider sales, where Yang, through Improve Forever, planned to sell 1 million ADS (which represented 13.8% of his total holdings), for gross proceeds of over $15.5 million, and Jin, through JingLong Group, planned to sell 2 million ADS (which represented 4.5% of his total holdings), for gross proceeds of $40,000,000, is significant, and supports a strong inference of scienter.  ¶¶123-24, 126.  These planned sales were also the first time that either Yang or Jin planned to sell any of their shares, and therefore the planned sales are unusual in the context of their historical trading patterns.  ¶¶123-24.  Likewise, the fact that one of the Defendants, Lui, did not plan any sales is not determinative because it is not necessary to allege that all insiders sold shares in order to adequately allege scienter.  *See In re APAC Teleservices, Inc. Sec. Litig.*, No. 97 Civ. 9145 (BSJ), 1999 U.S. Dist. LEXIS 17908, at *21 (S.D.N.Y. Nov. 19, 1999) ("[t]he fact that not every one of the defendants may have sold stock does not defeat an inference of scienter").  Accordingly, Plaintiff's allegations, taken collectively and accepted as true, raise a strong inference of scienter and Defendants have not presented a more compelling non-fraudulent inference.

### C.    The SAC Adequately Alleges Loss Causation

To establish loss causation, a plaintiff need only "'plead that the loss was foreseeable and caused by the materialization of the risk concealed by the fraudulent statement.'"  *In re Initial Pub. Offering Sec. Litig.*, 544 F. Supp. 2d 277, 288 (S.D.N.Y. 2008) ("*IPO II*").  Moreover, the Supreme

Court in *Dura Pharms. Inc. v. Broudo*, 544 U.S. 336, 346 (2005), acknowledged that a "short and plain statement" will suffice to plead loss causation. The alleged facts must support an inference that the "'misstatements and omissions concealed the circumstances that bear upon the loss,'" and that all or a portion of the loss would not have occurred absent the fraud. *IPO II*, 544 F. Supp. 2d at 289. However, "there is no 'requirement that the disclosure take a particular form or be of a particular quality.'" *Id*. Rather, a plaintiff may tie the dissipation of the artificial inflation caused by the fraud to a series of disclosing events. *Id*.

As Defendants concede, the SAC adequately satisfies this standard. *See, e.g.* ¶¶127-36. Indeed, their only challenge for dismissal on this basis is that Plaintiff cannot plead loss causation because the SAC does not contain any actionable misstatements or omissions. *See* Def. Mem. at 25. Since, as discussed above, the SAC does plead actionable misstatements and omissions, Plaintiff has also adequately alleged that Defendants' fraudulent conduct caused Plaintiff's loss.[15]

## IV.    CONCLUSION

For the foregoing reasons, Defendants' motion to dismiss should be denied in its entirety.[16]

DATED:  November 5, 2009                    COUGHLIN STOIA GELLER RUDMAN
                                              & ROBBINS LLP
                                            SAMUEL H. RUDMAN
                                            DAVID A. ROSENFELD
                                            ERIN W. BOARDMAN

                                            /s/ *David A. Rosenfeld*
                                            DAVID A. ROSENFELD

---

[15]  Defendants Yang, Lui and Jin do not dispute that they are "control persons" for purposes of §20(a) of the Exchange Act, but instead contend that Plaintiff has failed to allege a primary violation of the securities laws. *See* Def. Mem. at 25. Since, as shown above, Plaintiff has alleged primary violations under §10(b) of the Exchange Act, the Court should also sustain Plaintiff's control person liability claims. *See, e.g., Katz*, 542 F. Supp. 2d at 275-76.

[16]  While Plaintiff understands that if the Court dismisses any of its claims, that dismissal will be with prejudice, to the extent that the Court believes that any defects could be cured on amendment, Plaintiff respectfully requests an opportunity to do so.

58 South Service Road, Suite 200
Melville, NY  11747
Telephone:  631/367-7100
631/367-1173 (fax)

*Lead Counsel for Lead Plaintiff and the Class*

HOLZER HOLZER & FISTEL, LLC
COREY D. HOLZER
MICHAEL I. FISTEL, JR.
200 Ashford Center North, Suite 300
Atlanta, GA  30338
Telephone:  770/392-0090
770/392-0029 (fax)

DYER & BERENS LLP
ROBERT J. DYER III
JEFFREY A. BERENS
682 Grant Street
Denver, Colorado 80203
Telephone:  303/861-1764
303/395-0393 (fax)

*Additional Counsel for Plaintiffs*

## CERTIFICATE OF SERVICE

I, David A. Rosenfeld, hereby certify that on November 5, 2009, I caused a true

and correct copy of the attached:

Memorandum of Law in Opposition to Defendants' Motion to Dismiss
Plaintiff's Second Amended Complaint

to be served: (i) electronically on all counsel registered for electronic service for this

case; and (ii) via email to all additional counsel on the attached service list.


　　　　　　/s/ *David A. Rosenfeld*
David A. Rosenfeld

JA SOLAR (LEAD)
Service List - 8/21/2009    (08-0238)
Page 1 of 1

**Counsel For Defendant(s)**

Frances P. Kao
Donna L. McDevitt
Ryan A. Horning
Skadden, Arps, Slate, Meagher & Flom LLP
155 North Wacker Drive, Suite 2700
Chicago, IL  60606-1720
 312/407-0700
 312/407-0411 (Fax)

Lea Haber Kuck
Skadden, Arps, Slate, Meagher & Flom LLP
Four Times Square
New York, NY  10036
 212/735-3000
 212/735-2000 (Fax)

**Counsel For Plaintiff(s)**

Samuel H. Rudman
David A. Rosenfeld
Erin W. Boardman
Coughlin Stoia Geller Rudman & Robbins LLP
58 South Service Road, Suite 200
Melville, NY  11747
 631/367-7100
 631/367-1173 (Fax)

Robert J. Dyer III
Jeffrey A. Berens
Dyer & Berens LLP
682 Grant Street
Denver, CO  80203-1764
 303/861-1764
 303/395-0393 (Fax)

Corey D. Holzer
Michael I. Fistel, Jr.
Holzer Holzer & Fistel, LLC
200 Ashford Center North, Suite 300
Atlanta, GA  30338
 770/392-0090
 770/392-0029 (Fax)